**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TAMMY KELLY,**

           **Plaintiff,**

**-vs-**        Case No. 6:04-cv-1262-Orl-KRS

**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION,**

           **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the Complaint filed by Tammy Kelly, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration. Doc. No. 11. This matter has been referred to me for disposition pursuant to 28 U.S.C. § 636(c).

**I.   PROCEDURAL HISTORY.**

On January 9, 2002, Kelly filed an application for a period of disability and disability insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI), 42 U.S.C. § 401, *et seq*., and supplemental security income payments under the Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. § 1382, *et seq*., alleging a disability onset date of May 16, 2001. TR. 49-52, 284-88. Kelly's applications were denied, initially and upon reconsideration.

Kelly requested a hearing before an administrative law judge (ALJ), which was held on January 14, 2004. TR. 306-26. Kelly testified at the hearing. She was represented by a "non-attorney." A vocational expert (VE) also testified at the hearing. *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Kelly had not engaged in substantial gainful activity since the alleged onset date of her disability. TR. 14. The ALJ concluded that the medical evidence indicated that Kelly suffered from a back disorder, diabetes, obesity, and high blood pressure. TR. 16. The ALJ determined that Kelly's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations. *Id*.

The ALJ found that Kelly had the residual functional capacity (RFC) "to lift/carry up to 10 pounds and . . . sit for up to 6 hours in an 8-hour workday and . . . stand and/or walk for up to 2 hours in an 8-hour workday." TR. 17.[1] In reaching this determination, the ALJ considered Kelly's complaints of depression. The ALJ accorded "little weight" to the opinion of Ramin D. Bonnet, D.O., one of Kelly's treating physicians, concluding that his opinion was "not supported by the medical evidence or [Kelly's] daily activities." *Id*. The ALJ stated that he gave "significant weight" to the opinions of two nonexamining physicians who reviewed Kelly's records at the

---

[1] This is consistent with sedentary work, which is defined by the regulations as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a) (OASDI), 416.967(a) (SSI). The regulations further provide that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id*.

request of the SSA. *Id*. He did not explain, however, why he did not adopt the postural limitations included in these reviewing physicians' RFC assessments.

The ALJ found that Kelly's "allegations and subjective symptoms [were] out of proportion and inconsistent with the medical evidence and . . . not fully credible . . . ." TR. 17. In support of this conclusion, the ALJ cited Kelly's activities of daily living, the lack of any restrictions or limitations imposed by physicians, and the evidence that she had no reported side effects from medication. TR. 17.

In closing, the ALJ noted that the VE testified that Kelly "could return to her past relevant work as office assistant as previously performed by her, which was sedentary to light and semiskilled." *Id*. In addition, the ALJ noted that the VE testified that Kelly could also perform the job of a receptionist and telephone order taker, both of which existed in significant numbers in the national economy. *Id.* Consequently, the ALJ determined that Kelly was not disabled. TR. 18.

Kelly requested review of the ALJ's decision by the Appeals Council. TR. 8. On June 18, 2004, the Appeals Council denied Kelly's request for review. TR. 5-7. This appeal timely followed. Doc. No. 1.

**II.   JURISDICTION.**

The ALJ's decision become the final decision of the SSA once the Appeals Council denied Kelly's request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981 (OASDI), 416.1481 (SSI). This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383.

**III.    STATEMENT OF FACTS.**

  A.    *Kelly's Testimony*.

Kelly was born on July 8, 1967.  TR. 310.  She completed high school.  Kelly is 5'7" tall, and she weighed 272 pounds at the time of the hearing.  *Id*.  Kelly testified that her weight had been as high as 290 pounds within the previous two years.  TR. 311.

Kelly previously worked as a housekeeper and small-parts "laminator."  TR.  311-13.  Kelly's most recent employment was as an office assistant at Food Lion.  TR. 311.  Kelly testified that this position required her to perform safe counts, run the register, conduct floor walks, and "pretty much run the front end."  *Id*.  She assisted with hiring and firing the staff.  TR. 77.  She was required to be on her feet for most of the day and she performed some stooping.  The job required her to lift up to ten pounds.  *Id*.

Kelly was injured in a car accident that took place in May 2001, after which she was unable to return to her job at as an office assistant.  TR. 312.  The accident aggravated a preexisting work-related injury of her back.  TR 318.  In addition to problems with her back, her left leg gave out at times whenever she had to stand for long periods.  Kelly also had a problem with her neck that caused numbness and swelling in her left hand. TR. 319.  Additionally, Kelly suffered from depression.  She explained that not being able to work was very stressful and depressing.  TR. 319-20.  She also had diabetes that was not well controlled due to stress.  TR. 320.

At the time of the hearing, Kelly was using pain patches and over-the-counter pain medication. TR. 316. Kelly took insulin for her diabetes.  TR. 318.   When her blood sugar was

not well controlled, she would become shaky, her vision would be blurred, and she would have a very dry throat. TR. 320.

Kelly indicated that she was only able to sit for thirty minutes without needing to "get up." TR. 316. She was able to stand for about five to ten minutes, after which her lower back and left leg began to hurt. TR. 317. She could lift about a half gallon of milk. TR. 319.

Kelly ordinarily woke up in the morning at 5:15 a.m. TR. 314. She was able to take care of her personal grooming needs. TR. 321. She performed routine household chores and cooked dinner for her family, but it took awhile for her to perform these activities. TR. 85, 314-15. She did her own grocery shopping, with the help of her daughter. *Id*. She attended church three times a week and drove the church van on occasion. TR. 315.

B.   *VE's Testimony*.

The VE testified that Kelly's past work as a supermarket office assistant was a sedentary job as defined in the *Dictionary of Occupational Titles* (DOT), but the job required a light level of exertion as Kelly performed it. TR. 322.

The ALJ asked the VE to assume the following hypothetical claimant:

> Assume that I have an individual between the ages of 34 and 36 with a high school education. Assume that this person is able to do light work with the following restrictions: that they are able to sit – this is not the maximum for the day but any period of a day sit for an hour to an hour and a half but would be required – or be allowed to stand and stretch at least after that period of time, standing 30 to 40 minutes [at a time] and then they would be allowed to sit or walking 30 to 40 minutes and they would be allowed to sit. With those limitations, would that person be able to do the . . . office assistant job in a grocery store?

TR. 323.  The VE responded that this claimant could not perform the job of office assistant as Kelly performed it, but the claimant could perform the job of office assistant as it was generally performed in the national economy.  *Id.*  The VE also enumerated other jobs available in the national economy that the hypothetical claimant could perform.  TR. 324.

In response to a question from Kelly's representative, the VE testified that if the claimant could work only two days per week and only five hours per day, there would be no full-time jobs that she could perform.  However, there might be some part-time work that this claimant could perform.  TR. 325.

      C.     *Vocational Evidence*.

On October 4, 2001, Juan F. Cruz, C.V.E.,[2] prepared a vocational evaluation report after working with Kelly for two days and administering certain tests.  TR. 181-88.  Cruz noted that Kelly had an eighth grade reading level, high school spelling level, and fifth grade arithmetic level pursuant to the Wide Range Achievement Test 3d Revision (WRAT R3).  TR. 183.  He noted that Kelly attended the two day evaluation session on time, and she was able to follow written and verbal instructions. TR. 186-87.   Cruz recommended job training for Kelly, including computer training that would allow her to work at a job with low to sedentary physical demands.  He also noted that Kelly would need accommodations such as an adjustable chair and the opportunity to stand occasionally to relieve stress in her back.  TR.  187.  Cruz noted that Kelly had demonstrated the capacity "to work two days at five [] hours per day."  *Id.*

---

[2] Certified Vocational Evaluator.

D.     *Medical Evidence*.

Kelly was treated by Ramin D. Bonnet, D.O, on several occasions from May 2001 to April 2002. TR. 155-80, 198-213.

On May 30, 2001, Kelly first sought treatment by Dr. Bonnet for complaints of middle and lower back pain following a motor vehicle accident that took place on May 16, 2001. TR. 179. Kelly reported that her pain was so excruciating that it disturbed her sleep. Dr. Bonnet noted that Kelly was taking Darvocet, but that the medication was not controlling her pain. Kelly reported that she was unable to stand or sit for a long period of time. Walking, movement, and any range of motion (ROM) exacerbated her pain. Kelly rated the pain as a ten on a scale of one to ten. *Id*. Dr. Bonnet observed that Kelly walked with an antalgic gait. TR. 179. An examination of Kelly's neck revealed muscle spasms and stiffness, and decreased ROM, especially on extension. An examination of her back revealed evidence of vertebral point tenderness, muscle spasm, and limited ROM. *Id*. Dr. Bonnet's assessment was that Kelly had the following: (1) lumbar sprain and strain; (2) thoracic sprain and strain; (3) left breast ecchymosis and nodule secondary to impact and possibility of scar tissue development; (4) post traumatic headache; and (5) insomnia. TR. 180.

Dr. Bonnet's subsequent treatment records reflect that Kelly continued to suffer from decreased ROM, muscle spasms, and vertebral point-tenderness, exacerbated by movement. TR. 155-80. Her pain level varied from moderate to severe, and she consistently demonstrated pain in her left leg and an antalgic gait. *Id*. A treatment note reflects that an MRI revealed disc bulges in

the thoracic spine.  TR. 174; *see also* TR. 123.  A surgical consultation was recommended in September 2001.  TR. 168.

Kelly was treated by Michel Van Thielen, R.P.T,[3] at Ormond Medical Center from June 1, 2001 to August 10, 2001.  TR. 104-119, 125-143.  On June 1, 2001, Van Thielen noted that Kelly presented with complaints of pain in her lumbar spine and left buttock.  Her symptoms were aggravating by bending and tended to worsen as the day progressed.  He noted that Kelly's spinal ROM was limited.  TR. 142.  At the conclusion of her treatment sessions with Kelly, Van Thielen opined that Kelly had some temporary relief from pain but no significant objective improvement.  TR. 104.

Kelly was treated by Michael J. Rodriguez, D.C.,[4] from July 23, 2001 to September 19, 2001.  TR. 145-54.  On July 25, 2001, Rodriguez noted that Kelly suffered from bilateral lower back pain and obesity.  He noted that Kelly's condition worsened as the day progressed.  TR. 149.  On September 12, 2001, Kelly reported that she was experiencing leg pain and that she was having difficulty cooking and cleaning.  Rodriguez recommended a TENS unit.  TR. 146.  On September 19, 2001, Rodriguez noted that Kelly seemed depressed and that she wanted to work.  TR. 145.

On November 12, 2001, Federico C. Vinas, M.D., examined Kelly and prepared a neurosurgical evaluation.  TR. 189-91.  Kelly presented with complaints of lower back and left lower extremity pain that radiated down her left lower back into the anterior aspect of her left lower extremity.  Kelly also complained of numbness, tingling, pins and needles, and a burning

---

[3] Registered Physical Therapist.

[4] Doctor of Chiropractic.

dysesthesia[5] in the same distribution of the left lower extremity. She rated the pain as a seven on a scale of one to ten. Kelly reported that her pain was exacerbated by sitting, standing, walking, bending forward or backward, and coughing or sneezing. TR. 189.

Dr. Vinas noted that Kelly was taking the following medications in varying dosages: (1) Lidoderm patch; (2) Ambien; (3) Lortab; (4) Skelaxin; (5) Ibuprofen; and (6) Tylenol. TR. 190. Dr. Vinas observed that Kelly had tenderness to palpitation at approximately the C7-T1 level. She had markedly limited ROM in her lumbar spine. Side bending and rotation were also limited. Kelly had pain in all motion and significant guarding. A straight-leg raising test[6] was positive on the left, negative on the right. Dr. Vinas observed that Kelly walked with an antalgic gait, but that she was able to stand from a seated position. TR. 191. Dr. Vinas noted that EMG and nerve conduction studies of Kelly's lower extremities revealed evidence of a left L5-S1 radiculopathy. TR. 192; *see also* TR. 120-22. An MRI also showed a diffuse disc bulge in the lumbosacral spine. Dr. Vinas recommended further testing to determine the cause of Kelly's pain. TR. 192.

---

[5] "Impairment of sensation short of anesthesia." STEDMAN'S MEDICAL DICTIONARY 531 (26th ed. 1995) (hereinafter "STEDMAN'S").

[6] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B., 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

Treatment notes from an unidentified treating source reflect that in January 2001, Kelly weighed 272 pounds. TR. 196. Notes dated December 2001, reflect that Kelly's diabetes was not controlled, and that Kelly experienced thirst and fatigue. Her weight was 277 pounds. TR. 195.

On January 7, 2002, Dr. Bonnet opined that Kelly suffered from lumbar radiculopathy. TR. 201. Dr. Bonnet stated that he was unsure if Kelly's condition was permanent or temporary. In response to a question on a form asking him to "list restrictions and what the individual is capable of doing and for how many hours/week," he wrote, "sta[n]ding > 2 hours; sit[t]ing > 2 hours." TR. 201.[7]

On February 20, 2002, Dr. Bonnet opined that Kelly had reached maximum medical improvement and that she had an 8% permanent impairment rating as a result of her motor vehicle accident. Dr. Bonnet also noted that Kelly should do no lifting, bending or twisting. TR. 200.

Treatment records from Ormond Medical Center dated February 24, 2002, indicate that Kelly suffered from transitional vertebra that caused low back irritability, pain and radiculopathy. Left leg raising was positive and degenerative changes were noted. The person who completed the form, whose name is illegible, opined that Kelly would have difficulty squatting due to pain in her lower back. TR. 219.

Treatment records from Quick Care Medical Treatment Center dated July 1, 2002, indicate that Kelly was diagnosed with degenerative disc disease and a herniated disc in her lower back. She weighed 269 pounds. TR. 230.

---

[7] Dr. Bonnet also appears to have indicated that Kelly was unable to lift anything over a certain weight, but I am unable to read the handwritten note regarding the amount of weight. TR. 201.

Treatment records from Bert Fish Medical Center dated July 18, 2002, indicate that Kelly was diagnosed with diabetes and hyperglycemia.[8]  TR. 267-69.  A treatment record dated May 22, 2003, reflects an additional diagnosis of hypertension (HTN).  TR. 278.

On July 20, 2002, Kelly was evaluated by Ronald I. Landau, M.D.  TR. 214-15.  Dr. Landau noted the presence of disk desiccation at the T9-10 and T10-11 levels.  He also noted that Kelly had mild to moderate disk bulging at T9-10 which was most severe in the flexion position as compared to the neutral and extension positions.  TR. 214-15.  Dr. Landau observed moderate disk bulging at T10-11, which was also most severe in the flexion position as compared with the neutral and extension positions.  Dr. Landau noted that a transitional vertebral body may have been present at the lumbosacral junction.  *Id*.

Treatment records from Quick Care Medical Treatment Center dated October 10, 2003, indicate that Kelly was assessed with, among other things, hyperlipidemia and obesity.  She weighed 277 pounds.  TR. 275.

On December 13, 2003, a physician from Bert Fish Medical Center noted that an MRI of Kelly's cervical spine revealed a minimal diffuse asymmetric disc bulge to the right at C4-5 resulting in flattening of the anterior thecal sac and narrowing of the right lateral recess, and reversal of the normal cervical lordosis.  TR. 283.

---

[8] "An abnormally high concentration of glucose in the circulating blood, seen especially in patients with diabetes mellitus."  STEDMAN'S at 825.

E.     *Reviewing Professionals*.

On July 16, 2002, Harry L. Collins, Jr., M.D., reviewed Kelly's records and prepared a physical RFC assessment at the request of the SSA. TR. 243-50. Dr. Collins opined that Kelly could frequently lift less than ten pounds and occasionally lift ten pounds. She could stand or walk (with normal breaks) at least two hours in an eight-hour workday. TR. 244. She could sit for about six hours in an eight-hour workday. Her ability to push and/or pull was unlimited. She could only climb, balance, stoop or crouch occasionally and she could never kneel or crawl. TR. 245. Kelly was to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. TR. 247. She was to avoid even moderate exposure to hazards, such as machinery and heights. *Id*. Dr. Collins opined that the severity of Kelly's symptoms were more than expected and that the alleged effect of her symptoms on function was not consistent with the evidence as a whole. TR. 248.

On March 22, 2002, Reuben E. Brigety, M.D., reviewed Kelly's records and prepared a physical RFC assessment at the request of the SSA. TR. 251-58. Dr. Brigety opined that Kelly could frequently lift less than ten pounds and occasionally lift ten pounds. She could stand or walk (with normal breaks) two hours in an eight-hour workday. She could sit for about six hours in an eight-hour workday. Her ability to push and/or pull was limited in her lower extremities. TR. 252. She could only climb, balance, stoop, kneel, crouch or crawl occasionally. TR. 253. Kelly was to avoid concentrated exposure to hazards, such as machinery and heights. TR. 255. Dr. Brigety noted that Kelly's "condition [was] further impacted by obesity." TR. 256.

**IV.     STANDARD OF REVIEW.**

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986). While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000. Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI or SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"[9]  42 U.S.C. §§ 423(d)(1)(A) (OASDI), 1382c(a)(3)(A) (SSI).

---

[9] A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) (OASDI),

The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) (OASDI), 1382c(a)(3)(B) (SSI).  Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI or SSI benefits.  In sum, when evaluating a claim for benefits under OASDI or SSI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment or combination of impairments severe?
> (3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?[10]

20 C.F.R. §§ 404.1520(a)(4) (OASDI), 416.920(a)(4) (SSI).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel*, 800 F.2d at 1030.

**V.    ANALYSIS.**

Kelly raises several issues on appeal.  First, Kelly argues that substantial weight was not given to the testimony of Dr. Bonnet, one of her treating physicians.  Next, Kelly contends the ALJ

---

1382c(a)(3)(D) (SSI).

[10] In an OASDI case, a claimant must also establish that she was disabled during the time that she was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

erred in determining that she could perform her past relevant work because her RFC finding was not supported by substantial evidence. Kelly further asserts that the ALJ erred in determining that she could perform other work in the national economy. Kelly next posits that her subjective complaints of pain were not properly evaluated. Kelly further argues that the ALJ failed to fully develop the record. Finally, Kelly contends the ALJ failed to comply with SSR 02-01p in not considering the impact of her obesity on her ability to do work. Doc. No. 15 at 1-2.

I address only some of these issues, because I find them to be dispositive. The ALJ rejected Dr. Bonnet's conclusion that Kelly could never lift, bend or twist, finding his opinion to be unsupported by medical evidence and inconsistent with Kelly's activities of daily living. I note that the medical records contain evidence that Kelly's back pain was exacerbated on movement. Dr. Vinas opined in November 2001, that Kelly had marked limitation of ROM in her lumbar spine, and that side bending and rotation (twisting) were limited. Van Thielen, a physical therapist, also opined in 2001 that Kelly had limited flexion in her back, and that bending increased her pain. Thus, the ALJ's conclusion that Dr. Bonnet's opinion is unsupported by medical evidence is not supported by substantial evidence.

Even assuming that Kelly's activities of daily living were sufficient to support the ALJ's decision to give little weight to Dr. Bonnet's RFC assessment, the ALJ's RFC assessment is not supported by substantial evidence. The ALJ stated that he gave "great weight" to the RFC assessment's by the reviewing physicians. He noted that both reviewing physicians opined that Kelly would have postural limitations on her ability to work. He did not explain why he did not include those postural limitations in his RFC assessment. Further, he did not address why he

simply ignored that opinion of both reviewing physicians that Kelly had environmental limitations in her ability to work.

"An ALJ is not free to base his decision on unstated reasons or hunches." *Davis v. Barnhart*, 377 F. Supp. 2d 1160, 1164 (N.D. Ala. 2005) (citing *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992)). Because the ALJ did not explain why he purported to rely upon the reviewing physicians' RFC assessments, then rejected portions of those decisions without explaining why he did so, he did not properly arrive at his RFC assessment. A faulty or unsupported RFC assessment necessarily undermines the conclusions reached at steps four and five of the sequential evaluation process. *Cf. Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (reversing decision of the Commissioner and remanding because ALJ did not properly assess claimant's mental impairments).

## VI.   CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings consistent with the foregoing analysis. The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 17th day of March, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties